648          December 20, 2023          No. 666

IN THE COURT OF APPEALS OF THE
STATE OF OREGON

NORTHWEST NATURAL GAS COMPANY,
Avista Corporation,
and Cascade Natural Gas Corporation,
*Petitioners,*

*v.*

ENVIRONMENTAL QUALITY COMMISSION,
*Respondent,*

*and,*

NATURAL RESOURCES DEFENSE COUNCIL,
*Intervenor-Respondent,*

*and,*

BEYOND TOXICS,
Climate Solutions,
Environmental Defense Fund,
Oregon Business Alliance for Climate-dba Oregon
Business For Climate,
and Oregon Environmental Council,
*Intervenors-Respondents.*
A178216 (Control)

OREGON FARM BUREAU FEDERATION;
Oregon Business & Industry Association;
Oregon Manufacturers and Commerce;
Alliance of Western Energy Consumers;
Associated Oregon Loggers, Inc.;
Northwest Pulp and Paper Association;
Oregon Association of Nurseries;
Oregon Forest And Industries Council;
Oregon Trucking Associations, Inc.;
Western Wood Preservers Institute;
Otley Land and Cattle, LLC;
and Space Age Fuel, Inc.,
*Petitioners,*

NATIONAL FEDERATION OF INDEPENDENT
BUSINESS,
*Intervenor-Petitioner,*

*v.*

ENVIRONMENTAL QUALITY COMMISSION,
*Respondent.*
A178217

WESTERN STATES PETROLEUM ASSOCIATION,
*Petitioner,*

*v.*

ENVIRONMENTAL QUALITY COMMISSION,
*Respondent.*

Environmental Quality Commission
A178218

Argued and submitted September 29, 2023.

Megan H. Berge, California, argued the cause for petitioners Northwest Natural Gas Company, Avista Corporation, and Cascade Natural Gas Corporation. Also on the briefs were Clifford S. Davidson, Drew L. Eyman, and Snell & Wilmer LLP; and Sterling Marchand, Scott Novak, and Baker Botts L.L.P., California.

Rachel C. Lee argued the cause for petitioners Oregon Farm Bureau Federation, Oregon Business & Industry Association, Oregon Manufacturers and Commerce, Alliance of Western Energy Consumers, Associated Oregon Loggers, Inc., Northwest Pulp and Paper Association, Oregon Association of Nurseries, Oregon Forest and Industries Council, Oregon Trucking Associations, Inc., Western Wood Preservers Institute, Otley Land and Cattle, LLC, and Space Age Fuel, Inc. Also on the briefs were Thomas R. Wood, Geoffrey B. Tichenor, and Stoel Rives LLP.

Steven G. Liday argued the cause for petitioner Western States Petroleum Association. Also on the briefs were Joshua M. Sasaki, Ivan Resendiz Gutierrez, Katelyn J. Fulton, and Miller Nash LLP.

Carson L. Whitehead, Assistant Attorney General, argued the cause for respondent Environmental Quality Commission. Also on the brief were Ellen F. Rosenblum, Attorney General, and Benjamin Gutman, Solicitor General.

Daniel C. Snyder and Public Justice, Washington, D. C., and Pete Huffman and Natural Resources Defense Council,

Washington, D. C., filed the brief for intervenor-respondent Natural Resources Defense Council.

Rachel C. Lee argued the cause for intervenor-petitioner National Federation of Independent Business. Also on the briefs were Thomas R. Wood, Geoffrey B. Tichenor, and Stoel Rives LLP.

Maura C. Fahey argued the cause for intervenor-respondents Beyond Toxics, Climate Solutions, Environmental Defense Fund, Oregon Business for Climate, and Oregon Environmental Council. Also on the brief were Erin Hogan-Freemole and Crag Law Center.

C. Robert Steringer, Erica Tatoian, and Harrang Long Gary Rudnick P.C. filed the brief *amicus curiae* for Office & Professional Employees International Union, Local 11.

Sadie Normoyle and Western Environmental Law Center filed the brief *amicus curiae* for Affiliated Tribes of Northwest Indians.

Jonah Sanford and Northwest Environmental Defense Center filed the brief *amicus curiae* for Northwest Environmental Defense Center, Pineros Y Campesinos Unidos del Noroeste, Oregon Public Health Association, Leslie Hammer, Ph.D., Our Climate, NAACP Eugene-Springfield Branch #1119, and Community Energy Project.

Molly Tack-Hooper and Earthjustice (Washington) filed the brief *amicus curiae* for Rogue Climate, Verde, and Columbia Riverkeeper.

Jesse A. Buss, Bridgett Chevallier, and Willamette Law Group, PC, filed the brief *amicus curiae* for New Seasons Market LLC, SERA Architects, Inc., Indow, Neil Kelly Company, and Friends of Family Farmers.

Before Egan, Presiding Judge, and Kamins, Judge, and Kistler, Senior Judge.

KAMINS, J.

Rules invalid.

**KAMINS, J.**

Petitioners challenge the validity of the administrative rules that establish the Climate Protection Program, OAR 340-271-0010 to 340-271-9000 (the CPP rules).[1] Those rules impose "cap and reduce" regulations on the distribution of fossil fuels in the State of Oregon and require certain large stationary sources to limit their emissions from industrial processes.

Pursuant to ORS 183.400,[2] petitioners raise numerous assignments of error, contending that the CPP rules are invalid. In this opinion, we address only one of those assignments, because it is dispositive regarding the validity of the CPP rules. Specifically, we agree that the Environmental Quality Commission (EQC), in adopting the CPP rules, did not comply with the heightened disclosure requirements applicable to it when it adopts rules that apply to entities required to obtain Title V permits under the federal Clean Air Act (Title V sources). ORS 468A.327(1).[3]

Because EQC, when adopting the CPP rules, did not comply—or even substantially comply—with the heightened disclosure requirements applicable to it when adopting rules that apply to Title V sources, we conclude that the CPP rules are invalid.

---

[1] Additionally, the CPP rules include amendments to other administrative rules, such as, as noted by one group of petitioners, OAR 340-012-0054.

[2] ORS 183.400 provides, in part:

"The validity of any rule may be determined upon a petition by any person to the Court of Appeals[.]"

[3] ORS 468A.327(1) provides:

"Prior to the adoption, amendment or repeal of any rule pursuant to ORS chapter 183 that applies to any facility required to pay fees under ORS 468A.315, the Environmental Quality Commission shall include with the notice of intended action required under ORS 183.335(1) a statement of whether the intended action imposes requirements in addition to the applicable federal requirements and, if so, shall include a written explanation of:

"(a) The commission's scientific, economic, technological, administrative or other reasons for exceeding applicable federal requirements; and

"(b) Any alternatives the commission considered and the reasons that the alternatives were not pursued."

I.   BACKGROUND

The Legislative Assembly has recognized that global warming "poses a serious threat to the economic well-being, public health, natural resources and environment of Oregon."[4] ORS 468A.200(3). Greenhouse gases (GHG) are gasses which "contribute[] to anthropogenic global warming." ORS 468A.210(2).

In 2020, recognizing the danger posed to Oregonians by GHG, then Governor Brown issued Executive Order 20-04, in which she directed EQC and the Department of Environmental Quality (DEQ) to develop rules establishing a sector specific GHG "cap and reduce program." Specifically, Governor Brown directed EQC and DEQ to "take actions necessary" to "cap and reduce" GHG emissions from large stationary sources, from transportation fuels, and from all other liquid and gaseous fuels.

In accordance with that directive, EQC and DEQ engaged in an extensive and public process to develop the CPP rules. As adopted, the rules aim to, among other things, "reduce greenhouse gas emissions from sources in Oregon." OAR 340-271-0010(3).

The CPP rules aim to reduce greenhouse gas emissions in two ways. First, they create a cap-and-reduce system under which DEQ distributes compliance instruments to covered fuel suppliers, with each compliance instrument authorizing the equivalent of one metric ton of carbon dioxide emissions. Second, they impose a technology and operations-based standard on certain large stationary sources that requires those sources to determine the best available emissions reductions and then take steps to achieve those reductions.

On review, in additional to various substantive challenges to the rules, one group of petitioners argues that the rules are invalid because they were not adopted in compliance with disclosure requirements for rulemaking in ORS 468A.327(1), which, as noted above, imposes

---

[4] "'Global warming'" means "'an increase in the average temperature of the earth's atmosphere that is associated with the release of greenhouse gases.'" ORS 468A.210(1).

heightened disclosure requirements for rulemaking when those rules apply to Title V sources. In response, EQC does not dispute that it did not comply with the requirements of ORS 468A.327(1). It contends, however, that we should not invalidate the CPP rules, because EQC "substantially complied" with those requirements.

As explained further below, we conclude that in a rule challenge pursuant to ORS 183.400(4)(c), the standard under which we review EQC's compliance with ORS 468A.327(1) is, simply, whether EQC complied with ORS 468A.327(1), not whether EQC "substantially complied," as EQC contends. Further, we conclude that, even if EQC is correct that it needed to only "substantially comply" with ORS 468A.327(1), it failed to do so. As a result, we conclude that the CPP rules are invalid.

## II.   ANALYSIS

We first explain why, in this rule challenge under ORS 183.400(4)(c), we review for EQC's compliance with the rulemaking procedures set forth in ORS 468A.327(1), not substantial compliance. We then explain that EQC failed to comply with ORS 468A.327(1) and that, even if substantial compliance was the standard, EQC failed to substantially comply with ORS 468A.327(1). Finally, we explain why our conclusions regarding compliance render the CPP rules invalid.

A.   *EQC Was Required to Comply with ORS 468A.327.*

As noted, petitioners bring this rule challenge pursuant to ORS 183.400. "Under ORS 183.400(1), 'any person' may petition this court to determine the validity of a rule." *Ciecko v. DLCD*, 290 Or App 655, 661, 415 P3d 1122 (2018) (some internal quotation marks omitted).

Our review of an administrative rule under ORS 183.400 "is limited to an examination of the rule under review, the statutory provisions authorizing the rule, and the documents necessary to demonstrate compliance with the applicable rulemaking procedures." *Id.* (citing ORS 183.400(3)). "After the limited examination, a court invalidates an administrative rule only if it finds that the rule

violates constitutional provisions, exceeds the statutory authority of the agency that adopted the rule, or was adopted without compliance with the applicable rulemaking procedures." *Id.* (citing ORS 183.400(4)).[5]

As a threshold issue, the parties dispute what standard this court applies when deciding whether to invalidate rules based on petitioners' procedural objections under ORS 183.400(4)(c). EQC, citing ORS 183.335(11)(a), contends that this court reviews the adequacy of EQC's notice of proposed rulemaking for "substantial compliance" with ORS 468A.327(1). As described more fully below, ORS 183.335 requires administrative agencies to publish a notice of proposed rulemaking prior to rulemaking, sets forth certain requirements for the contents of that notice, and provides that "a rule is not valid unless adopted in substantial compliance with the provisions of this section." As EQC points out, and as also described more fully below, the "'doctrine of substantial compliance has previously been used * * * to avoid the harsh results of insisting on literal compliance with statutory notice provisions where the purpose of these requirements has been met.'" *Friends of the Columbia Gorge v. Energy Fac. Siting Coun.*, 365 Or 371, 389, 446 P3d 53 (2019) (quoting *Brown v. Portland School Dist. #1*, 291 Or 77, 81, 628 P2d 1183 (1981) (omission in *Friends of the Columbia Gorge*)).

Petitioners disagree. They contend that actual compliance with ORS 468A.327(1) is required, and that substantial compliance is not sufficient.

"Whether the doctrine of substantial compliance applies is a question of statutory interpretation." *Tompte v. Stone*, 195 Or App 599, 602, 98 P3d 1171 (2004); *Parthenon Construction & Design, Inc. v. Neuman*, 166 Or App 172, 180, 999 P2d 1169 (2000) (considering the text of a statute in determining whether the doctrine of substantial compliance was applicable). In interpreting a statute, we "ascertain the

---

[5] ORS 183.400(4) provides:

"The court shall declare the rule invalid only if it finds that the rule:

"(a) Violates constitutional provisions;

"(b) Exceeds the statutory authority of the agency; or

"(c) Was adopted without compliance with applicable rulemaking procedures."

legislature's intentions by examining the text of the statute in its context, along with relevant legislative history, and, if necessary, canons of construction." *State v. Little*, 326 Or App 788, 791, 533 P3d 11070 (2023) (internal quotation marks omitted). In ascertaining the legislature's intentions, our lodestar is the statutory text, as "there is no more persuasive evidence of the intent of the legislature than the words by which the legislature under-took to give expression to its wishes." *SAIF v. Ward*, 369 Or 384, 394, 506 P3d 386 (2022) (internal quotation marks omitted).

In this case, to help frame our analysis regarding whether the standard is "compliance" or "substantial compliance," we begin by describing the Supreme Court's decision in *Friends of the Columbia Gorge*, before turning to the text, context, and legislative history of ORS 468A.327(1).

1.    Friends of the Columbia Gorge

In *Friends of the Columbia Gorge*, the Supreme Court considered whether to apply a "compliance" or a "substantial compliance" standard when evaluating the validity of a rule in a challenge brought under ORS 183.400(4)(c).

In that case, the petitioners challenged rules adopted by the Energy Facility Siting Council (EFSC), contending that, in adopting the rules at issue, EFSC had failed to comply with the procedural requirements of ORS 183.335. 365 Or at 376. The petitioners argued that a "strict-compliance" standard applied, because ORS 183.400(4)(c) requires "compliance with applicable rulemaking procedures." *Id.* at 377. EFSC argued that a "substantial compliance" standard applied, because "chapter 183 requires only 'substantial compliance' with the notice procedures contained in ORS 183.335" and each of the "petitioners' procedural objection arises under ORS 183.335." *Id.* at 376-77.

Framing the issue as one involving its "standard of review" and "what standard [the Supreme Court] applies when deciding whether to invalidate rules based on a petitioner's procedural objections," the court agreed with EFSC that "substantial compliance" was the standard, reasoning:

"Petitioners' reliance on ORS 183.400(4)(c) begs the question of what an agency must do to comply with applicable

rulemaking procedures. At least with regard to the proce-
dures in ORS 183.335, an agency satisfies those statutory
requirements by substantially complying with the proce-
dures set out in the statute. In that sense, a rule adopted in
substantial compliance with ORS 183.335 is a rule adopted
in 'compliance with applicable rulemaking procedures.'"

*Id.* at 377.

   In our view, the Supreme Court's analysis in *Friends
of the Columbia Gorge* demonstrates that, in reviewing a
rule challenge brought under ORS 183.400(4)(c), whether
we review for "compliance" or "substantial compliance" is a
function of the statutory section setting forth the specific
procedures for promulgating the rule. While some rulemak-
ing statutes, such as ORS 183.335—the statute at issue in
*Friends of the Columbia Gorge*—require only substantial
compliance, others, such as ORS 196.471, appear to require
actual compliance. *See Ciecko*, 290 Or App at 668 (in chal-
lenge under ORS 183.400(4)(c) asserting agency did not com-
ply with rulemaking requirements set forth in ORS 196.471,
invalidating rules because, among other reasons, agency
failed to "comply with applicable rulemaking procedures
set out in ORS 196.471").[6] Thus framed, the question in this

---

   [6] We pause to note that, historically, we have not always been consistent in
describing our standard of review in rule challenges brought pursuant to ORS
183.400(4)(c).

   In *Ciecko*, for example, we applied a compliance standard, invalidating rules
when those rules did not "comply with the applicable rulemaking procedures."
290 Or App at 668. In explaining our standard of review under ORS 183.400,
we noted that "a court invalidates an administrative rule only if it finds that
the rule violates constitutional provisions, exceeds the statutory authority of the
agency that adopted the rule, or was adopted without compliance with the appli-
cable rulemaking procedures." *Id.* (citing ORS 183.400(4)). But we did not further
explain why we were applying a "compliance" standard rather than a "substan-
tial compliance" standard in that case. *See generally id.*

   In contrast, in *County of Morrow v. Dept. of Fish & Wildlife*, 178 Or App 329,
333, 37 P3d 180 (2001), we pointed to a "substantial compliance" standard being
applicable, stating, "[w]e may invalidate an administrative rule if it was adopted
without substantial compliance with applicable rulemaking procedures. ORS
183.335(10)(a); ORS 183.400(4)(c)." But beyond bare citation to ORS 183.335(10)
(a) and ORS 183.400(4)(c), we did not explain why a "substantial compliance"
standard was appliable given the particular challenges to the administrative
rule in that case. Further, in *County of Morrow*, our analysis demonstrated the
administrative agency in fact complied with the applicable rulemaking proce-
dures and therefore the result would have been the same regardless of whether
our review was for "compliance" or "substantial compliance." That is, we do not
understand our standard of review to have been a live issue in the case.

case is whether the legislature intended to incorporate the doctrine of substantial compliance into ORS 468A.327(1) or whether it intended to require actual compliance.

With that in mind, we turn to ORS 468A.327(1) to determine whether it requires substantial or actual compliance.

### 2. *ORS 468A.327(1)*

The particular rulemaking requirements that petitioners contend EQC did not comply with are found in ORS 468A.327(1), which provides:

> "Prior to the adoption, amendment or repeal of any rule pursuant to ORS chapter 183[, *i.e.*, the Administrative Procedures Act,] that applies to any facility required to pay fees under ORS 468A.315[, *i.e.*, any facility with a Title V operating permit], the Environmental Quality Commission *shall include* with the notice of intended action required under ORS 183.335(1) a statement of whether the intended action imposes requirements in addition to the applicable federal requirements and, if so, *shall include* a written explanation of:

> "(a)   The commission's scientific, economic, technological, administrative or other reasons for exceeding applicable federal requirements; and

> "(b)   Any alternatives the commission considered and the reasons that the alternatives were not pursued."[7]

(Emphases added.)

---

In any event, as described above, in view of the Supreme Court's analysis in *Friends of the Columbia Gorge*, we understand our standard of review under ORS 183.400(4)(c) to turn on the particular statute or rule imposing the rulemaking procedures at issue.

[7] The parties do not dispute that the phrase "facility required to pay fees under ORS 468A.315" in ORS 468A.327(1) means any facility with a Title V operating permit.

In short, ORS 468A.315(1) sets fees for sources "subject to the federal operating permit program," a phrase which ORS 468A.300(3) defines as "the program established by [EQC] and the [DEQ] pursuant to ORS 468A.310." And ORS 468A.310 requires EQC and DEQ to establish "a federal operating permit program as required to implement Title V [of the federal Clean Air Act, *see* ORS 468A.300(5)]. *See also* Testimony, Joint Subcommittee on Natural Resources, Senate Bill (SB) 107, Apr 19, 2007 (Andrew Ginsburg, DEQ air quality administrator) (explaining that the legislation now codified at ORS 468A.327(1) "would require us to do more public disclosure when we adopt rules that affect Title V sources").

As an initial matter, in considering what the legislature intended with regard to ORS 468A.327(1), we note that it twice uses the word "shall"—*i.e.*, the EQC "*shall* \* \* \* include a statement*" of whether the intended action imposes requirements in addition to the applicable federal requirements and, if so, "*shall* include a written explanation" of the "commission's scientific, economic, technological, administrative or other reasons for exceeding applicable federal requirements" and any "alternatives the commission considered and the reasons that the alternatives were not pursued." The term "'shall' is a command expressing what is mandatory." *Bacote v. Johnson*, 333 Or 28, 33, 35 P3d 1019 (2001). That is, when the legislature uses the term "shall," it intends to create a mandatory obligation. *Little*, 326 Or App at 793 (citing cases using the term "shall" for the proposition that "[t]he legislature knows how to indicate a mandatory obligation"). That indicates that the legislature intended the requirements imposed by ORS 468A.327(1) on EQC when adopting rules that apply to Title V sources to be mandatory.

It is also noteworthy that, elsewhere, the legislature has expressly imposed a "substantial compliance" standard when that is what it intended. *See, e.g.*, ORS 250.085 ("The Supreme Court shall review the title for substantial compliance with the requirements of ORS 250.035."); ORS 222.310 ("ORS 222.210 to 222.310 shall be construed liberally, and substantial compliance with the provisions of those sections shall be sufficient."); ORS 25.287(d) ("The only issues at proceedings under this subsection are whether three years have elapsed, or such shorter cycle as determined by rule of the department, and whether the support obligation is in substantial compliance with the formula established under ORS 25.275."). And it is particularly noteworthy that, elsewhere, when the legislature has used "shall" in conjunction with a rulemaking requirement but intended to impose only a "substantial compliance" standard, it has said so expressly. ORS 183.335 (setting forth requirements for rulemaking using the word "shall" but noting "a rule is not valid unless adopted in substantial compliance with the provisions of this section"); ORS 183.341 (providing that agencies "shall adopt rules of procedure which will provide a reasonable opportunity for interested persons to be notified of the agency's

intention to adopt, amend or repeal a rule" and noting rules are invalid if not adopted in "substantial compliance" with the rules regarding notice adopted by the agency).

That indicates that the "legislature knows how to provide for substantial compliance [with] a statutory requirement when it decides that such a doctrine is appropriate." *Tompte*, 195 Or App at 603; *see also Villanueva v. Board of Psychologist Examiners*, 175 Or App 345, 357, 27 P3d 1100 (2001), *adh'd to on recons*, 179 Or App 134, 39 P3d 238 (2002) ("When the legislature [has] intended to permit substantial compliance with * * * statutory notice requirements, [it has] said so expressly."). And further, it knows how to do so in the context of rulemaking. ORS 183.335(11)(a); ORS 183.341(5). But it did not do so in ORS 468A.327. Thus, it appears that the legislature intended to require EQC to comply—not merely "substantially comply"—with the requirements of ORS 468A.327 when adopting rules that apply to Title V sources. *See* ORS 174.010 ("In the construction of a statute, the office of the judge is simply to ascertain and declare what is, in terms or in substance, contained therein, not to insert what has been omitted[.]").

One piece of statutory context potentially pointing in the other direction is ORS 183.335, the statute EQC cites in contending that we should apply a "substantial compliance" standard in reviewing this rule challenge. Indeed, ORS 183.335(1) is expressly cross-referenced in ORS 468A.327(1).

As relevant here, ORS 183.335(1)[8] requires agencies, "prior to the adoption, amendment or repeal of any rule," to give "notice of its intended action" in various ways;

---

[8] ORS 183.335(1) provides:

"Prior to the adoption, amendment or repeal of any rule, the agency shall give notice of its intended action:

"(a)  In the manner established by rule adopted by the agency under ORS 183.341(4), which provides a reasonable opportunity for interested persons to be notified of the agency's proposed action;

"(b)  In the bulletin referred to in ORS 183.360 at least 21 days prior to the effective date;

"(c) At least 28 days before the effective date, to persons who have requested notice pursuant to subsection (8) of this section; and

"(d)  Delivered only by electronic mail, at least 49 days before the effective date, to the persons specified in subsection (15) of this section."

ORS 183.335(2)[9] contains requirements regarding the contents of the notice of intended action; and ORS 183.335(11)(a) provides:

> "Except [in circumstances not present here], a rule is not valid unless adopted in substantial compliance with the provisions of this section in effect on the date that the notice required under subsection (1) of this section is delivered to the Secretary of State for the purpose of publication in the bulletin referred to in ORS 183.360."

We do not, however, understand the substantial compliance provision set forth in ORS 183.335(11)(a) to apply to the information that EQC is required to disclose under ORS 468A.327(1), as EQC contends. That is because, by its terms, the substantial compliance provision of ORS

---

[9] ORS 183.335(2) provides, in part:

"(b) The agency shall include with the notice of intended action given under subsection (1) of this section:

"(A) A citation of the statutory or other legal authority relied upon and bearing upon the promulgation of the rule;

"(B) A citation of the statute or other law the rule is intended to implement;

"(C) A statement of the need for the rule and a statement of how the rule is intended to meet the need;

"(D) A list of the principal documents, reports or studies, if any, prepared by or relied upon by the agency in considering the need for and in preparing the rule, and a statement of the location at which those documents are available for public inspection. The list may be abbreviated if necessary, and if so abbreviated there shall be identified the location of a complete list;

"(E) A statement of fiscal impact identifying state agencies, units of local government and the public that may be economically affected by the adoption, amendment or repeal of the rule and an estimate of that economic impact on state agencies, units of local government and the public. In considering the economic effect of the proposed action on the public, the agency shall utilize available information to project any significant economic effect of that action on businesses which shall include a cost of compliance effect on small businesses affected. For an agency specified in ORS 183.530, the statement of fiscal impact shall also include a housing cost impact statement as described in ORS 183.534;

"(F) A statement identifying how adoption of the rule will affect racial equity in this state;

"(G) If an advisory committee is not appointed under the provisions of ORS 183.333, an explanation as to why no advisory committee was used to assist the agency in drafting the rule; and

"(H) A request for public comment on whether other options should be considered for achieving the rule's substantive goals while reducing the negative economic impact of the rule on business."

183.335(11)(a) refers to only the requirements imposed in ORS 183.335 itself—that is the plain meaning of "substantial compliance with the provisions of *this section*." (Emphasis added.) Put another way, the requirements imposed by ORS 468A.327(1) on EQC when adopting rules that apply to Title V sources are not requirements imposed by ORS 183.335. And we do not think it is a natural reading of ORS 468A.327(1) and ORS 183.335 that the requirements imposed by ORS 468A.327(1) become requirements imposed by ORS 183.335 merely because they must be disclosed in the notice that is required by ORS 183.335(1). Had the legislature intended substantial compliance with the disclosure requirements set forth in ORS 468A.327(1) to be sufficient, it would have said so, just as it did when setting forth certain requirements for rulemaking in other sections of the Oregon Revised Statutes, such as ORS 183.335 and ORS 183.341, as described above.[10]

Our understanding that the legislature intended compliance (not merely substantial compliance) with ORS 468A.327(1) finds support in that statute's legislative history. That history reflects that the legislative intent in enacting ORS 468A.327(1) was to require heightened disclosure requirements for EQC when adopting rules that apply to Title V sources in part to provide assurance to industry that EQC had "looked at all the issues." Testimony, Joint Subcommittee on Natural Resources, Senate Bill (SB) 107, Apr 19, 2007 (John Ledger, Associated Oregon Industries).

ORS 468A.327 was enacted as 2007, as SB 107. Or Laws 2007, ch 480, § 3. As initially introduced, the bill increased fees on Title V sources in order to assist with staffing shortages at DEQ in operating Oregon's Title V program. SB 107, Introduced; Testimony, Joint Subcommittee on Natural Resources, SB 107, Apr 19, 2007 (Andrew Ginsburg, DEQ air quality administrator). Under federal law, that program is required to be completely funded from fees from Title V sources, and the fees had not kept up with costs of

---

[10] We note that ORS 183.335 was enacted in 1971, while ORS 468A.327 was enacted over three decades later in 2007. Or Laws 2007, ch 480, § 3. We do not understand the intent of the 1971 Legislative Assembly in enacting ORS 183.335 to have any bearing on our effort to discern the intent of the 2007 Legislative Assembly in enacting ORS 468A.327.

running the program. *Id.* After it was introduced, SB 107 was amended to include the disclosure requirements now found in ORS 468A.327(1), to provide the right to a hearing before EQC in certain circumstances when new rules apply to Title V sources,[11] and to phase in the fee increases that were proposed in the initial version of SB 107.

Testifying in support of the amendments to SB 107, DEQ air quality administrator Andrew Ginsburg explained that the amendments to SB 107 and, specifically, the disclosure provisions now in ORS 468A.327(1), would "require us to do more public disclosure when we adopt rules that affect Title V sources." Testimony, Joint Subcommittee on Natural Resources, SB 107, Apr 19, 2007 (Andrew Ginsburg). Ginsburg explained that prior to SB 107, if EQC adopted "a rule that's more stringent than a federal rule, [it] already disclosed the difference and the reason that we're being different from the federal law," but that SB 107 added the requirement that EQC also "describe what alternatives we considered and why we rejected the alternatives." *Id.* Additionally, John Ledger, on behalf of Associated Oregon Industries (AOI), explained that AOI supported SB 107, as amended to contain the disclosure requirements now in ORS 468A.327(1), in part, because it "gives assurances to industry that when the EQC does go beyond federal [law] they've looked at all the issues" and "gets more information

---

[11] The hearing provisions in ORS 468A.327 provide, in pertinent part:

"(3) Notwithstanding ORS 183.335 (3), an opportunity for an oral hearing before the commission regarding the statement specified in subsections (1) and (2) of this section shall be granted only if:

"(a) The request for a hearing is received, within 14 days after the commission issues the notice of intended action required under ORS 183.335 (1), from 10 persons or from an association having no fewer than 10 members; and

"(b) The request describes how the persons or association that made the request will be directly harmed by the adoption, amendment or repeal of a rule under subsection (1) of this section.

"(4) If an oral hearing is granted under subsection (3) of this section, the commission shall give notice of the hearing at least 14 days before the hearing to the persons or association requesting the hearing, to any persons who have requested notice pursuant to ORS 183.335 (8) and to the persons specified in ORS 183.335 (15).

"(5) Subsection (3) of this section does not apply if the commission includes with the notice of intended action required under ORS 183.335 (1) a notice that an oral hearing will be held before the commission."

out there to the public and everybody else." Testimony, Joint Subcommittee on Natural Resources, SB 107, Apr 19, 2007 (John Ledger, AOI). Ledger explained that AOI did not support SB 107 as initially introduced, but did support the bill with the amendments that required EQC to make the disclosures now required by ORS 468A.327(1). *Id.*

In consideration of that legislative history, as well as the statutory text and context, we conclude that ORS 468A.327(1) was intended to ensure more—not less—disclosure to Title V sources and not incorporate the doctrine of substantial compliance. That is, we understand ORS 468A.327 to require what it says—that when EQC makes rules that apply to Title V sources, it shall disclose the information specified in ORS 468A.327(1).

In sum, in rule challenges brought under ORS 183.400(4)(c) contending that EQC did not comply with ORS 468A.327(1), we review for whether EQC actually complied with the requirements of ORS 468A.327, not for whether EQC "substantially complied."

B.  *EQC Did Not Comply, Nor Did it Substantially Comply, with ORS 468A.327(1).*

Petitioners challenging EQC's compliance with the disclosure requirements of ORS 468A.327(1) raise two contentions: first, that the notice of proposed rulemaking in the Secretary of State's bulletin improperly omitted "(1) any statement regarding whether the CPP Rules exceed federal requirements on Title V facilities, (2) any description of the alternatives considered, and (3) any explanation why those alternatives were rejected"; and second, that other forms of notice EQC gave "failed to include the statutorily mandated information about alternatives and why they were not pursued."

In response, EQC "acknowledges that the notice submitted to the Secretary of State did not include an explicit statement about additional federal requirements for large stationary sources,"[12] but contends that on the facts of this case "EQC substantially complied with ORS

---

[12]  Although EQC points out that the Secretary of State's bulletin did "contain notice that the regulations apply to large stationary sources."

468A.327." Specifically, EQC asserts that its notice of proposed rulemaking, which it posted on its website and sent to a distribution list of over 20,000 recipients, contained the statement required by ORS 468A.327(1). And, according to EQC, that notice, coupled with "18 months of public process regarding the rules," demonstrates that the public and interested parties had "ample notice that the rules would impose additional requirements on large stationary sources, explained why the rules were needed, and explained the alternatives considered." Therefore, in EQC's view, it substantially complied with ORS 468A.327.

As we have concluded, substantial compliance with ORS 468A.327(1) is not sufficient. The statute requires actual compliance. EQC did not comply with ORS 468A.327(1) when it adopted the CPP rules, nor does it even contend that it did. We thus conclude, as explained below, that the CPP rules are invalid. But further, to the extent that ORS 468A.327(1) does incorporate the doctrine of substantial compliance, we would reach the same conclusion regarding the validity of the CPP rules.

Substantial compliance can "be defined only in general language," but at bottom it "'requires compliance in respect to the essential matters necessary to assure every reasonable objective of the statute.'" *Rogers v. Roberts,* 300 Or 687, 691, 717 P2d 620 (1986) (quoting *Sabatini v. Jayhawk Construction Co., Inc.,* 214 Kan 408, 411, 520 P2d 1230 (1974)). "'What constitutes substantial compliance with a statute is a matter depending on the facts of each particular case.'" *Id.* at 692 (quoting *In re Santore,* 28 Wash App 319, 327, 623 P2d 702, 1234 (1981)).

Here, the chief difficulty with EQC's argument is with the notice of proposed rulemaking itself. That is, we disagree that that notice contained the statement required by ORS 468A.327(1) as EQC contends. EQC's notice stated, in pertinent part, as follows:

"**Federal relationship**

"**Relationship to federal requirements**

"ORS 183.332, 468A.327 and OAR 340-011-0029 require DEQ to attempt to adopt rules that correspond with

existing equivalent federal laws and rules unless there are reasons not to do so.

"The proposed rules are 'in addition to federal requirements' since there are no federal regulations that require the reduction of greenhouse gas emissions from most of the affected parties."

" * * * * *

**"What alternatives did DEQ consider if any?**

"In designing the Climate Protection Program, DEQ considered many alternatives contained in the proposed rule. Extensive outreach with stakeholders beginning in March 2020, input from the advisory committee in 2021, and public comment throughout the process informed the design of the program. Documentation is in the rulemaking record."

(Boldface in original; font size modified.) But, as noted above, ORS 468A.327(1)(b) requires that ECQ's notice of proposed rulemaking include "a written explanation" of "[a]ny alternatives the commission considered and the reasons that the alternatives were not pursued." We understand that requirement to be essential to serving one purpose of ORS 468A.327(1), *viz.*, to "give[] assurances to industry that when the EQC does go beyond federal [law] they've looked at all the issues." Testimony, Joint Subcommittee on Natural Resources, SB 107, Apr 19, 2007 (John Ledger, AOI).

Here, the rulemaking record reflects that EQC and DEQ did, in fact, consider alternatives to the CPP rules that were adopted, and we do not understand EQC to argue otherwise. Indeed, the notice of proposed rulemaking itself reflects that "DEQ considered numerous options that were informed by other jurisdictions' greenhouse gas programs." Regarding those alternatives, however, the notice of proposed rulemaking merely states that "DEQ considered many alternatives contained in the proposed rule" and asserts "[d]ocumentation is in the rulemaking record." It does not explain or attempt to explain "the reasons that the alternatives were not pursued" or describe those alternatives, as required by ORS 468A.327(1)(b). Nor does it point to where in the rulemaking record such information might be found, or even assert that that information can be found in the rulemaking record. Nor does the 18 months of public

process, during which DEQ and EQC sought input from the public and stakeholders, substantially satisfy the requirement that EQC in its notice of rulemaking reduce to writing why it was not pursuing the alternatives it had considered when regulating Title V sources. It is not "insisting on literal compliance with statutory notice provisions," *Friends of the Columbia Gorge*, 365 Or at 389, to require EQC's notice to reflect an attempt to comply with ORS 468A.327(1)(b), which, as noted, we understand to be essential to serving one purpose of ORS 468A.327(1).

Although EQC engaged in a robust process that provided the public a great deal of transparency and numerous opportunities for engagement, it nevertheless did not substantially comply with its obligation to provide the specific types of disclosures required by ORS 468A.327(1)(b). Thus, even if we were reviewing for substantial compliance instead of compliance, we would reach the same conclusion regarding the validity of the CPP rules.

C.	*The CPP Rules Are Invalid.*

The remaining question is the appropriate remedy; that is, which rules are we are required to hold invalid in this rule challenge pursuant to ORS 183.400(4)(c). In a footnote, EQC contends that if we agree with petitioners' argument that it failed to provide the disclosure required under ORS 468A.327(1), the correct remedy would be to invalidate only those rules that regulate large stationary sources. In response, petitioners who challenge EQC's compliance with ORS 468A.327(1), contend that at least one Title V source is a "fuel supplier" under the rules creating the cap-and-reduce system. In their view, because the rules creating the cap-and-reduce system apply to a Title V source and were adopted without compliance with ORS 468A.327, those rules, too, are invalid.

We agree with petitioners. As noted, the heightened disclosure requirements in ORS 468A.327(1) are applicable when EQC adopts any rule "that applies to any facility required to pay fees under ORS 468A.315," *i.e.*, any facility with a Title V operating permit. Because the rules creating the cap-and-reduce system do apply to at least one Title V

source and were adopted without compliance with ORS 468A.315(1), those rules are invalid.[13]

### III.   CONCLUSION

In sum, for the reasons above, we conclude that the CPP rules are invalid.

Rules invalid.

---

[13] We also note that, part and parcel with those CPP rules discussed above that apply directly to Title V sources, are CPP rules pertaining to community climate investment entities, OAR 340-271-0900 through 340-271-0990. It is not clear to us how those rules could function on their own without the rules that create the cap-and-reduce system, nor does EQC advance an argument that we should hold those rule valid if we determine that the rules that apply to large stationary sources and the rules that create the cap-and-reduce system are invalid, as we do in this opinion. *See, e.g.*, OAR 340-271-0900(2) (setting forth permissible uses for community climate investment funds); OAR 340-271-0020(9) (defining community climate investment funds as "money paid by a covered fuel supplier to a community climate investment entity to support implementation of community climate investment projects").